AO 106 (Rev. 04/10) Application for a Search Warrant

## UNITED STATES DISTRICT COURT
### for the
Western District of Arkansas
El Dorado Division

| | |
|---|---|
| US DISTRICT COURT WESTERN DIST ARKANSAS **FILED** 12/13/2022 | |

IN THE MATTER OF THE SEARCH OF CONTENT AND INFORMATION ASSOCIATED WITH THE FACEBOOK USER ACCOUNT IDENTIFIED BY THE USERNAME 'Michael Cummings' AND THE UNIQUE ID NUMBER 1542323280 WHICH IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC.

No. _____   1:22-cm-00059

**Filed Under Seal**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe property to be searched and give its location):*
**See "Attachment A."**

located in the Northern District of California, there is now concealed *(identify the person or describe the property to be seized):*
**See "Attachment B." This Court has authority to issue the requested search warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A), and Federal Rule of Criminal Procedure 41.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
    [ x ] evidence of a crime;
    [   ] contraband, fruits of crime, or other items illegally possessed;
    [ x ] property designed for use, intended for use, or used in committing a crime;
    [   ] a person to be arrested or a person who is unlawfully restrained.

The search is related to violations, in the Western District of Arkansas, of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession of a controlled substance with intent to distribute and distribution of a controlled substance; |
| 21 U.S.C. § 843(b) | Unlawful use of a communication facility to commit and facilitate the commission of drug trafficking offenses |

The application is based on these facts:  (See attached affidavit of SA James Arnold, FBI)
[ x ]  Continued on the attached sheet.

[   ]  Delayed notice of __ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*BAB*

(Appearing by telephone conference call at 415-527-5035)
SA James Arnold, Federal Bureau of Investigation
*Affiant*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035.

Date: __12-13-22__

*Judge's signature*

City and state: __Texarkana, AR__

Hon. Barry A. Bryant, United States Magistrate Judge, W. D. Ark.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

IN THE MATTER OF THE SEARCH OF
CONTENT AND INFORMATION
ASSOCIATED WITH THE FACEBOOK USER
ACCOUNT IDENTIFIED BY THE
USERNAME 'Michael Cummings' and THE
UNIQUE ID NUMBER 1542323280 WHICH IS
STORED AT PREMISES CONTROLLED BY
META PLATFORMS, INC.

No. _____

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, James Arnold, a Special Agent with the Federal Bureau of Investigation (FBI), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I have been employed as a Special Agent of the FBI since October 2019. Prior to my employment with the FBI, I served as a law enforcement officer in South Carolina for approximately nine and one-half years. During that time, I also served as a criminal analyst for the South Carolina Governors Counterdrug Task Force assigned to the Drug Enforcement Administration (DEA). I am currently assigned to the FBI Little Rock Division, El Dorado Resident Agency, where I am charged with investigating violations of various federal criminal laws.  I have been trained and/or involved in various aspects of criminal investigations, including, among other things, debriefing defendants, sources, and informants; conducting surveillance and undercover operations; executing arrest and search warrants; monitoring Title III wiretaps; and analyzing documentary and physical evidence.  My duties as a Special Agent

with the FBI also include the enforcement of federal criminal statutes focused on firearms, drug trafficking violations and criminal street gangs.

2.      Your Affiant makes this affidavit in support of an application for a search warrant for information associated with the "Facebook" social media user account associated with the unique user name "Michael Cummings" and user ID 1542323280, stored at any premises controlled by Meta Platforms, Inc., a social networking provider (formerly named Facebook, Inc.) which is headquartered at 1601 Willow Road, Menlo Park, CA 94025, in the Northern District of California, which information and account are further described in Attachment A hereto (hereinafter the "**TARGET ACCOUNT or TA#4** ").  The information to be searched is described in the below paragraphs and in Attachment A hereto.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta Platforms, Inc., to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B hereto.  Government-authorized persons will then review that information to locate the items described in Section II of Attachment B.

3.      Based on your affiants training and experience and the facts as set forth in this Affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841(a)(1) (distribution of, and possession with intent to distribute, controlled substances, and conspiracy to commit same) and Title 21, United States Code, Section 843(b) (use of a communication facility to commit a felony drug offense) have been committed by an individual using **TA#4**.

4.      There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and fruits of these crimes as further described in Attachment B.

5.    Your affiant makes this affidavit based on his participation in this investigation, as well as information and reports received from other law enforcement agents, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or facts that I am aware of relating to this investigation.

## JURISDICTION

6.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A) and (c)(1)(A). Specifically, the Court of the Western District of Arkansas is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.    In April of 2018, the FBI's El Dorado Resident Agency (RA) opened an investigation into a Drug Trafficking Organization (DTO) based in Magnolia, Columbia County, Arkansas, which is in the Western District of Arkansas. The portion of the investigation involving Christopher WALTERS was initiated based on intelligence gathered from a confidential source. WALTERS and several co-conspirators have been identified as members of the Walters Drug Trafficking Organization (WDTO) who were collectively involved in street gang activity and poly-drug trafficking in and around Columbia County, Arkansas. As detailed below, WALTERS is believed to have been a large quantity poly-drug distributer who obtains illegal drugs, including methamphetamine, from or through multiple sources of supply, including Michael CUMMINGS a/k/a "Main".

**July 2021 Interview of CS-1**

8.      In July of 2021, an FBI TFO interviewed a Confidential Source (hereinafter "CS-1") in reference to distribution of narcotics in Magnolia, Arkansas.  CS-1 stated that WALTERS relocated from Watts, California, to Magnolia, Arkansas, in 2016 and is a member of the PJ Watts Crip criminal gang. CS-1 further indicated that WALTERS is a large-scale distributer of methamphetamine, ecstasy, pills, and marijuana.  CS-1 stated, in part, that WALTERS' source of supply (hereinafter SOS), who WALTERS referred to as "Main," is located in California.

**February 2022 Controlled Purchase of Methamphetamine from Walters**

9.      In early February 2022, a confidential source (hereinafter CS-2) made a consensually monitored telephone call to WALTERS at 870-904-7344 (hereinafter TT#1), in order to arrange a later controlled purchase of methamphetamine from WALTERS. The call was recorded and completed in the presence of Agents.  During the call, WALTERS answered and immediately told CS-2 that he would 'hit him right back,' which I know, from my training and experience, is slang indicating that WALTERS would return CS-2's call shortly. Soon thereafter, CS-2 received a return call from WALTERS, this time calling from the telephone number 323-841-0813 (Target Telephone Two or TT#2).  Area code 323 is assigned to areas of Los Angeles, California.  During that call, which was also recorded, CS-2 requested two (2) pounds of methamphetamine, to which WALTERS responded "Let me know when you're on your way. I'll have that shit put together for you." CS-2 indicated that he/she believed that WALTERS was probably in California at the time, resupplying on methamphetamine.

10.     On or about February 10, 2022, acting under the control and supervision of the FBI, CS-2 conducted a controlled purchase of approximately 453 grams (approximately one pound) of methamphetamine from WALTERS, via an unknown male (UM) intermediary (later

identified as GRISSOM), in McNeil, Columbia County, Arkansas.  While meeting with agents prior to that buy, CS-2 also showed agents text messages between CS-2 and TT#1, in which WALTERS told CS-2 to give the cash to 'his boy.'  In the presence of Agents, CS-2 sent a text message to the TT#1 advising WALTERS of his/her location and asking what to do.  Soon thereafter, CS-2 received a telephone call from UM at 870-949-4757 (hereinafter TT#5), who advised CS-2 where to meet him. CS-2 also received a text message from TT#1 which shared the UM's contact information, including the above phone number ending in 4757 and a name of "Lil John".  After being equipped with one or more covert audio/video recording devices, with which to record the transaction, CS-2 then departed the meeting with agents and met the UM, who led him/her by vehicle to a residence in McNeil, Arkansas

11.    On or about February 10, 2022, acting under the control and supervision of the FBI, CS-2 conducted a controlled purchase of approximately 453 grams (approximately one pound) of methamphetamine from WALTERS, via an unknown male (UM) intermediary (later identified as John GRISSOM a/k/a "lil John"), in McNeil, Columbia County, Arkansas.  While meeting with agents prior to that buy, CS-2 also showed agents text messages between CS-2 and TT#1, in which WALTERS told CS-2 to give the cash to 'his boy.'  In the presence of Agents, CS-2 sent a text message to the TT#1 advising WALTERS of his/her location and asking what to do.  Soon thereafter, CS-2 received a telephone call from UM at 870-949-4757 (hereinafter TT#5), who advised CS-2 where to meet him. CS-2 also received a text message from TT#1 which shared the UM's contact information, including the above phone number ending in 4757 and a name of "Lil John".  After being equipped with one or more covert audio/video recording devices, with which to record the transaction, CS-2 then departed the meeting with agents and met the UM, who led him/her by vehicle to a residence in McNeil, Arkansas.  Shortly thereafter,

CS-2 returned to meet with agents, at which time CS-2 turned over to agents approximately 453 grams (approximately 1 pound) of suspected methamphetamine, which CS-2 indicated had been provided to them by the above-described UM. A NIC field test of the suspected methamphetamine was conducted and provided a presumptive positive indication for the presence of methamphetamine or methylenedioxymethamphetamine (MDMA or "ecstasy"), which I know from my training and experience are chemically related. Both methamphetamine and MDMA are controlled substances under federal law. Based on the appearance of the substance tested, and in consideration of their training and experience, agents have concluded that the substance contains methamphetamine. A review of the audio and video recording of the above-described controlled purchase was consistent with the information provided by CS-2. Although the UM's face cannot be seen in the recording (he wore a mask during the transaction with CS-2), his clothing and other identifying characteristics can be seen.

12.     Immediately after CS-2 finished the above-described February 10 drug transaction, agents also followed the red Honda Accord from where it had been seen stopped by CS-2's vehicle. As agents followed it, the red Honda Accord travelled south on U.S. 79, towards Magnolia, Arkansas, eventually turning into the Magnolia Walmart parking lot. Agents then observed a man get out of the passenger side of the red Honda Accord. The man was wearing clothes similar to those worn by the masked man video described in the preceding paragraph but was not masked. He also appeared to fit the same general description of the masked man in the video. Agents observed the man enter the Walmart store, and then come out again a short while later, carrying a receipt.

13.     Investigators later obtained Walmart surveillance footage from February 10, 2022. A review of that footage clearly shows the above-described man from the red Honda

Accord entering the store, going to the Walmart MoneyCenter[1], counting U.S. Currency while in line, and completing a transaction at the MoneyCenter counter. The description of the man matches that of the masked man from the February 10 controlled purchase. CS-2 also later independently advised agents that the masked man from the February 10 controlled purchase was in fact GRISSOM.

### Identification of TT#2

14.     On March 16, 2022, at the direction of law enforcement, CS-2 attempted to place a recorded telephone call to TT#1 which was not answered[2]. CS-2 subsequently sent a text message to TT#1 and received no reply. On March 17, 2022, while on the phone with your affiant, CS-2 called WALTERS by way of Facebook Messenger. Although the call could not be heard by your affiant, CS-2 reported that WALTERS answered and stated that he would call CS-2 right back. While still communicating with your affiant by phone, CS-2 received a call from TT#2. Although the call could not be heard by your affiant, CS-2 reported that WALTERS had called using TT#2, and stated that he no longer utilized TT#1, and that TT#2 was his new number[3].

### June 2022 Distribution of Methamphetamine by Walters

15.     On or about May 20, 2022, a reliable confidential source of information began providing the FBI significant evidence indicating that WALTERS, and several associates, were

---

[1] According to the Walmart webpage, the Walmart MoneyCenter offers a wide variety of financial services including cash and transfer services, insurance, tax services, and more.

[2] CDR's do not reveal this attempted contact between TT#1 and CS-2. However, CS-2 utilized a proprietary FBI dial-in recording system, records from which show that s/he did, in fact, attempt to call TT#1.

[3] While agents do not have a recording of this telephone call, a review of CDR's obtained for TT#2 confirm that this call between CS-2 and TT#2 did take place. Since the call was incoming, and was received outside of the physical presence of Agents, it was unable to be recorded.

continuing to distribute various illegal drugs in and around Columbia County, Arkansas. Furthermore, information obtained through the reliable confidential source of information, as well as court ordered geolocation data associated with TT#2, indicated that WALTERS had travelled to California. The following instance represents a portion of the information obtained through the reliable confidential source of information:

16.    On June 7, 2022, Marcus JORDAN and others, including Christopher WALTERS, Lacadran THOMAS (a/k/a "Mooney") and Dawnisha Jordan (hereinafter "D. JORDAN") arranged and conducted an illicit drug transaction. According to the above-referenced reliable source of information, the transaction began when, during a June 7 conversation between THOMAS and WALTERS, THOMAS said 'Alright, uhh, made a little play wolla go and hell, need that back (or possibly bag)'.  From my training and experience in this and similar investigations, I interpret THOMAS' statements as meaning that THOMAS had completed a drug transaction and was requesting a resupply from WALTERS.  In response to that request by THOMAS, the same source of information indicates that WALTERS told THOMAS to let him call someone, which I interpret to mean that WALTERS would begin to arrange the requested resupply

17.    Not long after the above-described conversation between WALTERS and THOMAS, the same reliable confidential source of information indicates that WALTERS contacted JORDAN.  During an exchange with JORDAN, which took place shortly thereafter, the same source of information indicates that WALTERS told JORDAN that 'the boy Mooney was trying to get a half.'  From my training and experience, including in this specific investiation, I interpret this as WALTERS telling JORDAN that THOMAS was attempting to obtain a half-pound quantity of methamphetamine.  The same source of information further

indicates that WALTERS then instructed JORDAN to take the methamphetamine to another location, and that THOMAS would walk over and pay JORDAN $1,250.

18.     Later on June 7, the same reliable confidential source of information indicates that JORDAN told WALTERS 'Yea, I was calling tell you I was at, uh, waiting on dude but shit I'm getting ready to leave hell.' From training and experience, I interpret this statement by JORDAN to mean that JORDAN had arrived at the stated location, but that THOMAS was not present. The same reliable source of information indicates that WALTERS replied to JORDAN 'Yea, drop that shit over my other house he can pull up over there and get it.' From training and experience, I interpret this to mean that WALTERS was instructing JORDAN to take the methamphetamine to another residence controlled by WALTERS, where THOMAS could pick it up. Thereafter, the same source of information indicates JORDAN told WALTERS 'well I gotta go back in there and get it out. It's in the house,' which I interpret to mean that JORDAN would have to go back inside a residence in order to retrieve the methamphetamine.

19.     Around the same time as the exchange between WALTERS and JORDAN described in the preceding paragraph, agents saw (through a covert remote surveillance device installed in the vicinity) a man known to them as JORDAN arriving at a residence located at 923 W Monroe Steet, Magnolia, Arkansas. JORDAN was seen entering the residence and then coming out again. Shortly thereafter, JORDAN was observed re-entering the residence and again coming out, this time with a large bulge in his left front pocket. JORDAN was then observed departing in hi his vehicle.

20.     The above-referenced reliable confidential source of information indicates that, around the same time on June 7, WALTERS told D. JORDAN that JORDAN was bringing 'something good' to her residence. The same source of information indicates that WALTERS

told D. JORDAN, 'Just go straight to the house - make sure you go straight to the house. When you get back from him, I'm gonna have the black boy Mooney come over there gonna give you twelve fifty.' From training and experience, and familiarity with this particular investigation, I believe this was WALTERS directing D. JORDAN to provide the methamphetamine to THOMAS and collect $1,250 from him.

21.     The above-referenced reliable confidential source of information further indicates that, not long thereafter, JORDAN asked WALTERS if D. JORDAN was at the residence, and that WALTERS told JORDAN she was on the way.

22.     Thereafter, through a different remote surveillance device installed in the vicinity of 1119 Linda Street, Magnolia, Arkansas, agents also saw JORDAN arrive at *that* residence. JORDAN was seen entering the Linda Street residence for a short time, coming out again, and departing in his vehicle.

23.     At around the same time, the above-referenced reliable confidential source of information indicates that THOMAS told WALTERS 'Okay I gotcha let figure out who I can to you know I'm not bring no anybody to ya spot but I gotcha.' From training, experience, and knowledge obtained in this specific investigation, I interpret this as THOMAS telling WALTERS he did not have a vehicle to drive, and that he did not want to have someone else drive him to the residence (and thus reveal its location to that person) in order to pick up the methamphetamine. The same source of information indicates that WALTERS then told THOMAS "I'm going to have her pull up on you because she about to go." I interpret this to mean that WALTERS would have a female—I believe D. JORDAN—bring the methamphetamine to THOMAS.

24.     Shortly thereafter, the above-referenced reliable confidential source of information indicates, WALTERS and D. JORDAN had an exchange which I interpret, based on my training, experience, and familiarity with the case, to be WALTERS directing D. JORDAN to deliver the half-pound of methamphetamine to THOMAS at THOMAS' residence, in exchange for $1,250.

25.     A short time later, through the use of remote surveillance, agents observed D. JORDAN departing 1119 Linda Street, Magnolia, Arkansas.  Although agents attempted to conduct physical surveillance of the transaction between D. JORDAN and THOMAS, Agents were unable to locate either of them.

### June 2022 Communication with Cummings

26.     On June 15, 2022, the aforementioned reliable confidential source of information indicated that WALTERS and CUMMINGS (the latter using telephone number 562-208-3513[4]), discussed obtaining a resupply of controlled substances, which would possibly be transported by train.  During the June 15 conversation between WALTERS and CUMMINGS, WALTERS stated 'hey imma umm, imma leave tomorrow night nigga so you don't think you can get him down here.' To which CUMMINGS replied in part, 'you gonna leave tomorrow night alright let me start looking right now, let me call that nigga at the train station.'

27.     According to the same reliable confidential source of information, later on the same day WALTERS and CUMMINGS continued discussing WALTERS' procurement of controlled substances from or through CUMMINGS.  During this conversation, CUMMINGS stated 'yea he would leave tomorrow like around like five something and he'll be there on

---

[4] Pursuant to an Administrative subpoena issued by the FBI, on June 24, 2022, Sprint identified the subscriber of this number as Michael Cummings of Hawaiian Gardens, California.

Sunday at 3:00 am.' To which WALTERS replied, in part, 'so i can drive down there and hurry up and see him and get right back.' CUMMINGS then asked WALTERS what type of illegal drugs he should send the individual with, 'But what what what you want to send him there with?' WALTERS then tells CUMMINGS that he has the money to pay both CUMMINGS and an unknown individual, 'Boy called me today so im ready for both of yall now.' At the conclusion of the conversation, CUMMINGS indicates that he will book something (possibly a train ticket) and that they will send the product after obtaining the payment, 'so when we get this bread back we send him on the next one gotcha' and 'I'm about to book it right now.'

28.     From my training, experience, and knowledge obtained during this specific investigation, I interpret the above-described June 15 conversations as involving WALTERS asking CUMMINGS to resupply WALTERS with illegal drugs.  I also believe that CUMMINGS indicated to WALTERS, during these conversations, that CUMMINGS would make contact with CUMMINGS' courier—who agents believe possibly travels by train—in order to obtain payment, and possibly resupply WALTERS with those illegal drugs.  From the content of the above-described June 15 conversations (and because the reliable confidential source of information has only indicated that CUMMINGS and WALTERS spoke by phone on that one single date) agents believe it likely that CUMMINGS and WALTERS also communicate via other means.

### June 2022 Communication with D. Jordan regarding "Main"

29.     On June 29, 2022, the same reliable confidential source of information indicated that WALTERS and D. JORDAN had a conversation in which WALTERS told D. JORDAN he would request that "Main" (possibly the SOS identified by CS-1) send her two-hundred dollars ($200) by way of Cashapp ('Let me try to see where Main at. Imma try to see if he'll Cashapp

you the money'). A short time later, the same reliable confidential source of information indicates that D. JORDAN told WALTERS she had received the two-hundred dollars from the individual, ostensibly "Main." Based on information obtained through the above-referenced reliable confidential source of information, no other phone communications by WALTERS are known to have taken place during the time between these two June 29 conversations. From my training and experience, I believe this indicates that WALTERS may have contacted "Main" utilizing some other means of communication.

### Facebook Communications between WALTERS and CUMMINGS

30. On July 7, 2022, Hon. Barry A. Bryant, United States Magistrate Judge for the Western District of Arkansas, issued a federal search warrant for the Facebook account belonging to WALTERS[5] (hereinafter TA#3). Pursuant to that order, Meta Platforms, Inc., provided records associated with TA#3. Although analysis is ongoing, a preliminary review of the information revealed significant Facebook Messenger communication regarding drug distribution between WALTERS (TA#3) and CUMMINGS[6] (TA#4).

31. During the preliminary review, your affiant observed communications between WALTERS and the user of the **TA#4** which began on August 6, 2021 and ended on June 29, 2022. A review of communications occurring on June 29, 2022, the date in which WALTERS told D. JORDAN that he would have "Main" send her money via Cashapp, revealed that

---

[5] Agents have probable cause to believe that TA#3 belongs to, and was being used by, Christopher WALTERS. Your affiant recognizes the male subject depicted in TA#3's current profile picture as WALTERS, from having previously viewed known images of him, including WALTERS' Arkansas driver's license photo.

[6] Agents have probable cause to believe that TA#4 belongs to, and is presently being used by, Michael CUMMINGS. Your affiant recognizes the male subject depicted several photos associated with TA# as CUMMINGS, from having previously viewed known images of him, including CUMMINGS' California driver's license photo.

WALTERS called CUMMINGS through Facebook Messenger's video chat feature and subsequently sent a photograph of a Cashapp account. The photograph depicted the Cashapp handle "$tyydagirly", which agent have preciously identified as being utilized by D. JORDAN[7]. Subsequently, the user of **TA#4** sent WALTERS a message stating "Just sent cuzzo." Moreover, based on your affiants training and experience, including with this and other investigations, additional communications observed indicate that the user of **TA#4** likely supplies or facilitates the supply of illegal drugs to WALTERS. Below is a portion of the Facebook Messenger communications between WALTERS and the user of the **TA#4,** between June 18 and June 22, 2022 as provided by Facebook:

> CW: "What time his train leaves"
> CW: "Michael missed your video chat" (Indicating the audio/video call was unanswered)
> TA#4: "Michael called you"
> CW: "Happy Father's Day"
> CW: "Address"
> TA#4: "3200 Bankhead Dr Little Rock Arkansas"
> TA#4: "262"
> TA#4: "Seal it cuzzo"
> CW: "Ok"
> CW: "Trying to get some rest real quick"
> TA#4: "Ok got you"
> CW: "You called Michael"
> TA#4: "The video chat ended"
> TA#4: "Michael called you"
> TA#4: "Michael called you"

---

[7] Open-source research conducted by the FBI associated this Cashapp account with D. JORDAN's telephone number 424-237-0358.

TA#4: "What's the total sent cuzzo"

CW: "28/25"

32.     I believe in the above referenced Facebook communication, WALTERS and CUMMINGS are likely discussing the same drug and/or money courier referenced in the above-described June 15, 2022 conversation (see paragraphs 26 thru 28). During this Facebook communication, WALTERS ask CUMMINGS when the courier is departing ("What time his train leaves"). Later, WALTERS asks for a location to meet the courier ("Address"), to which CUMMINGS replies and provides an address and room number ("3200 Bankhead Dr Little Rock Arkansas", "262"). Later, CUMMINGS ask WALTERS how much US Currency he provided the courier ("What's the total sent cuzzo"), to which WALTERS replies "28/25," which I interpret to mean $28,000 and $25,000.

33.     According to court authorized location data associated with TT#2, at approximately the same time as the above-described Facebook communications, WALTERS was travelling from California to Arkansas. Furthermore, according the same above reference confidential reliable source of information, at approximately the same time as the above-described Facebook communications, WALTERS had a discussion with D. JORDAN in which WALTERS directed D. JORDAN to obtain the US Currency and have it prepared upon his arrival to Arkansas. During this June 18, 2022 conversation, WALTERS told D. JORDAN "He make it up there like around the time I make it to you," apparently referring to the aforementioned courier. WALTERS also stated "Shit. I prolly lay down like two hours and something. Jump on the highway. Go up there to wherever homie gone be at. *unintelligible* He gotta get a room too. He getting a room cause he comin in today at three. So he got the room already for today. So when he get there he just gone check in, then *unintelligible*." Subsequently,

WALTERS directs D. JORDAN to begin gathering the US Currency in preparation to pay the courier, "When they give you that money I need you um. Twenty-eight... Twenty-eight thousand five hundred ($28,500). Then I need another twenty-five thousand ($25,000). *unintelligible* twenty-eight and twenty-five." As noted in a preceding paragraph, this payment amount is consistent with the amount discussed with CUMMINGS by way of **TA#4** (see paragraph 32). Based on my training and experience, including with this and other investigations, I believe WALTERS is indicating that he plans to meet D. JORDAN and obtain the US Currency, then meet the courier at an undisclosed motel or hotel room in order to provide payment for illegal drugs.

34.    Additionally, during the preliminary review your affiant also observed what is believed to be drug ledgers reflecting balances paid and or owed towards the purchase of illegal drugs. For example, on May 7, 2022, the user of **TA#4** told WALTERS "Man I thought you was sending the money for the glass, tablets and transport.. that nigga could've flew back with 4400." Based on my training and experience, I know that "glass" is a common street name for methamphetamine and "tablets" is referring to pills. Additionally, on May 2, 2022, the user of TA#4 sent WALTER the following ledger, "-$14,250 Sun glasses, -$2000 trans -$1400 green screen -dogs_____ -candy's _____." Again, based on my training and experience and discussion with other law enforcement officers, "sun glasses" is likely referring to methamphetamine and "trans" is likely referring to the cost associated with paying the courier to transport the illegal drugs.

### Summary of Probable Cause

35.    Based on the forgoing, there is probable cause to believe that CUMMINGS, the user of **TA#4**, supplied or facilitated the supply of illegal drugs to WALTERS, including

methamphetamine. Furthermore, there is also probable cause to believe that CUMMINGS utilized **TA#4** in the furtherance his drug trafficking.

## TECHNICAL BACKGROUND ABOUT FACEBOOK

36.     Meta Platforms, Inc., owns and operates a free-access social networking website called "Facebook," which can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts which can then be used to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

37.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

38.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

39.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a

Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

40.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

41.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

42.    Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

43.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

44.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (i.e., non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

45.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

46.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

47.     Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJoumal, and Blogger.

48.     The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

49.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

50.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

51.     Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

52.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's

profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

53.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

54.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

55.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol eIP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

56.     Therefore, the computers of Meta Platforms, Inc., are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

57.     There is reason to believe Meta Platforms, Inc., is still in possession of the above-described records relating to **TARGET ACCOUNT**, as a preservation request was submitted electronically to Meta Platforms, Inc., (then known as Facebook, Inc.) on August 7, 2022, requesting that, for a period of 90 days, the company "take all necessary steps to preserve records and other evidence in its possession pending the issuance of a court order or other process," pursuant to 18 U.S.C. § 2703(f).

### PRIOR SEARCH WARRANT

58.     On November 9, 2022, a search warrant was issued by United States Magistrate Judge Barry Bryant in case number 1:22-CM-56.  That search warrant, which was issued based on an affidavit I presented, authorized a search of the same Facebook user account described in Attachment A hereto, for the same materials and evidence described in Attachment B.  The deadline for execution of that earlier search warrant was set for November 23, 2022, and the warrant specifically ordered Meta Platforms, Inc., to produce the materials on or before that date. I served that search warrant on Meta Platforms, Inc., on November 10, 2022.  It was not until November 30, 2022, *after* the expiration of the November 23, 2022, production deadline, that the FBI received notice that Meta Platforms, Inc., is now prepared to produce the materials and evidence required by the November 9, 2022, search warrant.  As of the date of this application, the FBI has not taken possession of, or received, any of those items from Meta Platforms, nor has it made any attempt to do so.  In consideration of certain dicta in the Eighth Circuit's opinion in

*United States v. Nyah* (928 F.3d 694, 700 (8th Cir. 2019)), the Government wishes to return the earlier search warrant (1:22-CM-56) to the Court, and to instead secure the evidence described in Attachment B via the new search warrant now sought by this Affidavit.  The Government will not take possession of the materials described in Attachment B unless and until the Court grants the new search warrant now sought, and will receive and search them only after that new warrant has been served upon Facebook, Inc.

## CONCLUSION

59.     Therefore, your affiant respectfully request this Court issue a search warrant authorizing the examination of information associated with the Facebook user account associated with the unique user name 'Michael Cummings' and unique user ID "1542323280"  stored at any premises controlled by Meta Platforms, Inc., a social networking provider headquartered at 1601 Willow Road, Menlo Park, CA 94025, in the Northern District of California, as described in Attachment A, and further authorizing the seizure the evidence, fruits, and instrumentalities described in Attachment B, which individually or collectively constitute evidence of violations of Title 21, United States Code, Sections 841(a)(1) [distribution of methamphetamine], as well as Title 21, United States Code, Section 843(b) [use of a communication facility to commit a felony drug offense].

60.     Because the warrant will be served on Facebook Inc., who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

(Appearing by telephone conference call at 415-527-5035)
James Arnold
Special Agent
Federal Bureau of Investigation


Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035 on this 13th day of December, 2022.


HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This search warrant applies to information associated with the Facebook user account associated with the username "Michael Cummings" and the unique user ID 1542323280 stored at any premises controlled by Meta Platforms, Inc., a social networking provider headquartered at 1601 Willow Road, Menlo Park, CA 94025, in the Northern District of California.

## ATTACHMENT B

### Particular Things to be Seized

**I.  Information to be disclosed by Meta Platforms, Inc.**

To the extent that any and all information in Attachment A is within the possession, custody, or control of Meta Platforms, Inc., including any messages, records, files, logs, or information that may have been deleted by a user but are still available to Meta Platforms, Inc., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta Platforms, Inc., is hereby ordered to disclose the following information to the government for each user ID listed in Attachment A **within fourteen (14) days of the issuance of this search warrant**:

(a)  All contact and personal identifying information, including for user ID 1542323280: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)  All activity logs for the account and all other documents showing the user's posts and other Facebook activities from **August 1, 2021 to November 9, 2022**;

(c)  All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from **August 1, 2021 to November 9, 2022**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)  All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments;

gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by the user from **August 1, 2021 to November 9, 2022**, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information;

(h)    All IP logs, including all records of the IP addresses that logged into the account;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook **webpages** and content that the user has "liked";

(j)    All information about the Facebook pages that the account is or was a "fan" of;

(k)    All past and present lists of friends created by the account;

(l)    All records of Facebook searches performed by the account from **August 1, 2021 to November 9, 2022**;

(m)    All information about the user's access and use of Facebook Marketplace;

(n)    The types of service utilized by the user;

(o)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

**Facebook is ordered to disclose the above information to the government within fourteen (14) days of the issuance of this search warrant.**

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of Title 21, United States Code, Section 841(a)(1) [distribution of methamphetamine] and Title 21, United States Code, Section 843(b) [use of a communication facility to commit a felony drug offense], including, but not limited to, information pertaining to the following matters:

(a) Any and all communications relating to the possession, manufacture, or sale of controlled substances.

(b) Evidence indicating the Facebook account owner's and/or user's state of mind as it relates to the crime(s) under investigation.

(c) Evidence indicating how, when, and the location(s) from which the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime(s) under investigation and to the Facebook account owner(s) and/or user(s).

(d) The identity of the person(s) who created or used the user ID, including and all records that help reveal the identity and whereabouts of such person(s).

(e) The identity of any person(s) who communicated with the user ID about matters relating to violations of Title 21, United States Code, Section 841(a)(1) [distribution of methamphetamine] and Title 21, United States Code, Section 843(b) [use of a communication facility to commit a felony drug offense].

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.